UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.     CASE NO.: 2:23-cr-88-SPC-KCD

DIOP MCKENZIE

## OPINION AND ORDER

Before the Court is Defendant Diop McKenzie's Motion to Suppress (Doc. 45), along with the Government's Response in Opposition (Doc. 51). The Court held an evidentiary hearing on the motion, at which time Defendant was present and represented by counsel. The Court reserved its ruling at the hearing and now denies Defendant's motion.

At the hearing, the Government called law enforcement witnesses, including Andrew Gallo of the Cape Coral Police Department, and presented exhibits in the form of body-worn camera footage. Defendant offered no witnesses. The Court makes these findings of fact based on the record, the parties' papers, and admitted exhibits.

Defendant's Motion to Suppress arises from a traffic stop that occurred on September 14, 2020. On that date, Defendant was stopped by Officer Gallo for driving with a suspended license.

But before we get to the stop itself, we need to discuss Defendant and Gallo's history. Just over a week before, Gallo responded to a domestic

disturbance at Defendant's home. The disturbance was a fight between Defendant and Lindsey Neal. Defendant spoke to Gallo about what happened, and the interaction between Gallo and Defendant was cordial. Then Gallo spoke to Neal. During the conversation, Neal mentioned that Defendant does not work—he obtains money by committing fraud. Gallo inquired further and Neal said there are already open cases against Defendant in Orlando, that he buys identities off the black market, and that he just got a PPP loan for $100,000. She told Gallo that Defendant also has an open case with the Cape Coral Police Department. Gallo asked her if she had any proof of Defendant stealing identities. Neal said she had the last digits of a credit card with someone else's name on it.

Fast-forward to the traffic stop on September 14th. The stop unfolded in several stages: ticket one (driving with a suspended license), an inventory search, ticket two (driving an unregistered motor vehicle), and then the search that is the subject of the motion to suppress.

Gallo pulled Defendant over at 20:08 for driving with a suspended license.[1] Gallo was training a fellow officer, Officer Hurst, that day. It is also clear that Gallo recognized Defendant as the driver before he pulled him over. Gallo instructed Hurst that when he approached the driver, he should state

---

[1] Time stamps are given based on Officer Gallo's and Officer Hurst's body-worn camera footage, admitted as Government Exhibits 4 and 5.

2

why he was pulled over and ask to see the driver's license. Then Gallo told Hurst to "verify his identity as McKenzie Diop and then we'll have him get out of the car, okay? Call for Code 10."

After being pulled over, Defendant confirmed that his license was suspended, but per department protocol, the officers waited for dispatch to confirm as well. Gallo assured Defendant a few minutes into the stop that because of COVID policies, he would not be arrested. About eight minutes into the stop, additional officers arrived, and Hurst began writing Defendant's ticket.[2] Gallo explained to the Defendant that his car would need to be towed and that the officers needed to conduct an inventory beforehand.

At about 12 minutes into the stop, it began to rain. Gallo said to Defendant, "If you'd like, I'll pat you down and make sure you don't have any weapons and then you can sit in the back of my car so we don't get soaking wet. How does that sound?" Defendant turned, placed his hands on the police car, and said, "Yeah." Gallo then patted him down. For the next half hour, Defendant sat in the back of the police car.

At this point, the inventory search was already underway. Gallo told the inventorying officer that Defendant was suspected of identity theft and to grab any credit cards or IDs. About 20 minutes into the stop, Gallo found a small

---

[2] Gallo testified that per department policy, some procedures require more than one officer. Per policy, a trainee officer is not counted as an officer in these instances.

3

backpack in Defendant's trunk and lamented to his fellow officer that it was empty.

Now for the second ticket. Between completing the vehicle inventory and the tow truck's arrival, Gallo and Hurst learned that Defendant's car was unregistered. Gallo told Defendant they would have to write him a second ticket for driving an unregistered vehicle.

The tow truck arrived, but the second ticket was not finished. The stop had been underway for about 35 minutes. A few minutes later, Gallo told the officer who conducted the inventory that he "was going to try to get consent to search [Defendant] . . . All he has is a wallet, but I just want to see what's in it. So I imagine he is going to say 'yes.'"

About 45 minutes into the stop, Hurst was still writing the second ticket. Gallo, seemingly annoyed with his trainee, told Hurst that the second ticket should include the same information as the first, except the cited statute. Defendant stepped out of the police car to call for a ride. At 20:56, the second ticket was finally ready. Hurst and Gallo then explained the tickets to Defendant.

Now we reach the final stage of the stop—the search. Gallo told Defendant, "You are free to leave, man." Defendant turned to walk away, and then the following exchange happened.

> Gallo: "Hey, before you leave would you have any issues with me just making sure you don't have anything on you, nothing illegal?"
>
> Defendant: "No, man."
>
> Gallo: "You got no issues with that?"
>
> Defendant, with no prompting, walked over the police car and put his hands on the hood.
>
> Gallo: "We're doing some training here, so . . . Today's training is going to be consensual searches, alright? So you're giving me consent to search you, right?"
>
> Defendant: "Yeah."
>
> Gallo: "Cuz you got nothing on you."
>
> Gallo began patting Defendant down. He pulled out Defendant's wallet and handed it to Hurst before continuing the patdown.
>
> Gallo: "Nothing in your wallet?"
>
> Defendant: "No."

Gallo concluded the patdown, removed Defendant's wallet from his pocket, and opened it. Defendant narrated the contents as Gallo flipped through the cards. Gallo pulled out two credit/debit cards. Defendant explained the cards were his stepdad's. Gallo said he wanted to confirm there was nothing criminal about the cards because the cards were not in Defendant's name. Hurst read Defendant his rights. Gallo asked Defendant if he understood his rights and asked him who the cards belonged to.

5

Defendant again claimed the cards belonged to his stepdad. Gallo asked the Defendant to call his stepdad so Gallo could verify.

Defendant did not want to call his stepdad and told Gallo to just keep the cards. Gallo asked him some follow-up questions to confirm that Defendant was surrendering the cards to the police department. At 21:04, Gallo began writing the property release form. At 21:08, Defendant signed the form and went on his way.

The two cards found in Defendant's wallet belonged to M.D. Defendant is now charged with wire fraud based on the "electronic transmission of fraudulent EIDL application in the name of M.D.." (Doc. 1 at 10). Defendant argues that "the Government's entire investigation had its genesis in the traffic stop" and that the cards and their fruits should be suppressed. (Doc. 45 at 7).

## DISCUSSION

Defendant's argument is two-tiered. He argues that any consent is invalid because it happened during an unlawfully prolonged traffic stop. And he argues that Gallo ultimately did not have consent to search his wallet.[3]

Defendant's prolonged-stop argument must fail because he was already free to leave when the search occurred. "[B]rief, consensual, and non-coercive

---

[3] Defendant also argues that the Government cannot rely on the "inevitable discovery/independent source" rule or that Defendant "abandoned" the cards by signing them over to the Cape Coral Police Department (Doc. 45 at 16-19). Based on the facts here, the Court need not delve into these arguments.

6

interactions [with police] do not require Fourth Amendment scrutiny." *United States v. Perkins*, 348 F.3d 965 (11th Cir. 2003) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)). Gallo told Defendant, "You are free to leave, man." And Defendant understood he could leave because he turned and began walking away from Gallo. Only after this did Gallo ask for consent to search Defendant. So, at the time of the search, Defendant's encounter with police was consensual.[4]

But even if the Court assumed an unlawfully prolonged traffic stop could taint a subsequent consensual encounter, Defendant's argument falls short because the traffic stop was not unlawfully prolonged.

The Fourth Amendment does not require a traffic stop to be completed within a set timeframe. *See United States v. Braddy*, 11 F.4th 1298, 1310 (11th Cir. 2021) (quoting *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015)) ("[W]e measure the reasonableness of a stop's duration under the totality of the circumstances . . . [r]igid time limitations and bright-line rules are

---

[4] Defendant likens this stop to the stop in *Florida v. Royer*, 460 U.S. 491 (1983). But in *Royer*, the Court found that Royer was detained because "the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart." *Royer*, 460 U.S. at 501. Here, the facts are completely different, and Defendant was not detained at the time of the search. Defendant was not informed that he was suspected of anything, remained in full public view on a busy roadway, had his license returned to him, and was expressly told he was free to leave. *See Royer*, 460 U.S. at 504 ("[B]y returning his ticket and driver's license and informing him that he was free to go if he so desired, the officers might have obviated any claim that the encounter was anything but a consensual matter from start to finish") (emphasis added).

generally inappropriate"). "[T]he tolerable duration" of a traffic stop is determined by the stop's "mission—to address the traffic violation that warranted the stop and attend to related safety concerns . . . Authority for the [stop] thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted).

This stop was reasonable in length. This stop comprised several segments—ticket one, the inventory search, ticket two, and the consent search. Gallo pulled Defendant over at 20:08 for driving with a suspended license. Defendant could not legally drive away. However, other officers needed to arrive and inventory the car before it could be towed. At about 20:16, those additional officers arrived, and Hurst began writing Defendant's ticket. Because the inventory search still needed to be done and the car still needed to be towed, this delay in ticket writing did not elongate the stop. The inventory search moved forward in an expeditious fashion.

At 20:28, Hurst called for a tow truck. At 20:31, Hurst completed writing the first ticket and handed it to Gallo for review. While corrections were being made, Gallo conducted a search on his laptop. Defendant watched the screen and asked from the back seat "does that tag belong to [unintelligible]?" About a minute later, the police confirmed via a database check that Defendant's car

8

was unregistered, and a second ticket was required. Hurst began writing the second ticket.

At 20:41, the tow truck arrived but Hurst had not yet completed writing the second ticket. Hurst's body-worn camera footage confirms that he was working expeditiously to complete the ticket, only taking a break to give the tow truck access to Defendant's car. Gallo repeatedly prompted his trainee Hurst to complete the second ticket. At 20:54, Hurst handed the second ticket to Gallo for review. The second ticket was completed at 20:56. Hurst explained the tickets to Defendant, and—a mere three minutes after the second ticket was completed—Gallo told Defendant he was free to leave.

The "[a]uthority for [a stop] . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 757 U.S. at 354. Here, the tasks tied to the traffic infractions were not complete until moments before Defendant was told he was free to leave. And, under these circumstances, the officers completed those tasks in a reasonable time.

The Court will now address the voluntariness and scope of the consent. Defendant argues that his consent was invalid because he was "grossly misled as to the purpose of the search" and "even if the consent to search his person had been valid, there was no consent to search his wallet." (Doc. 45 at 12).

Defendant's argument about being misled is a non-starter. While deceit by police can affect voluntariness under limited circumstances, generally "[t]he

9

subjective motivation of the officers is irrelevant" because "coercion is determined from the perspective of the suspect." *United States v. Spivey*, 861 F.3d 1207, 1215 (11th Cir. 2017). Accordingly, "whether officers deliberately lied does not matter because the only relevant state of mind for voluntariness is that of [the suspect] himself . . . And officers are entitled to be silent about their motivations." *Id*. (internal citations omitted).

"Whether a suspect voluntarily gave consent to search is a question of fact to be determined by a totality of the circumstances." *United States v. Blake,* 888 F.2d 795, 798 (11th Cir. 1989) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 249-50 (1973)). The government bears the burden of proving consent and that the consent was free and voluntary. *Blake,* 888 F.2d at 798 (citing *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir. 1987)). The Eleventh Circuit has considered the following non-exhaustive list when assessing voluntariness: the voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found. *Blake,* 888 F.2d at 798.

Defendant's consent was free and voluntary. At the time of the consent search, he had been informed he could leave and was engaging with Gallo

10

voluntarily. Defendant knew he was free to leave, as demonstrated by the fact that he had already begun walking away from Gallo. And Gallo phrased the search inquiry as a question rather than command ("Hey, before you leave would you have any issues with me just making sure you don't have anything on you, nothing illegal?"). This question made it clear to Defendant that he had a right to refuse the search. Gallo explicitly asked whether he had Defendant's consent ("Today's training is going to be consensual searches, alright? So you're giving me consent to search you, right?"). Defendant appears to be intelligent—he answers Gallo's questions intelligently and says he is a business owner who has worked in construction and real estate.

But most important regarding consent, Defendant cooperated with Gallo for the entire stop and repeatedly demonstrated that he was comfortable with Gallo. Defendant recognized Gallo a few minutes into the stop. They chatted about various things. Gallo showed Defendant how many citations he had for driving with a suspended license, and they laughed about it. Defendant mentioned riding a motorcycle and Gallo joked "you mean you don't ever drive it because you don't have a license, right?" Defendant said "exactly," and they laugh about that too.

Defendant remained cooperative and comfortable with Gallo even after he was told he was free to leave. When Gallo asked to search him, McKenzie voluntarily placed his hands on the hood of the police car without being

11

directed. He then remained chatty and cooperative as Gallo looked through his wallet. Defendant discussed fishing with Gallo in response to Gallo finding his fishing license. Defendant narrated the contents of his wallet, noting that the business card inside was for his attorney. Nothing suggests that Defendant was uncomfortable with Gallo looking in his wallet or that his consent was less than free and voluntary.

This leaves the issue of the scope of the search. A consent search is reasonable under the Fourth Amendment provided the search does not exceed the scope of consent given to police. *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992). Police are not required to specifically request consent to search item by item. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("Respondents argue . . . that if the police wish to search closed containers within a car they must separately request permission to search each container. But we see no basis for adding this sort of superstructure to the Fourth Amendment's basic test of objective reasonableness"). Instead, when police receive a general statement of consent, the scope of consent is "constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991).

Here, Defendant provided a general statement of consent. He consented to let Gallo search him for anything "illegal." It was reasonable for Gallo to

believe Defendant's general consent included his wallet. Illegal items can be found in wallets. And Defendant's actions during the search confirm that it did not exceed the scope of Defendant's consent. Defendant narrated the search of his wallet, volunteering information as Gallo removed items. Gallo's interpretation of the scope of consent is further buttressed by the context in which that consent was given. During the first search of Defendant, Gallo said, "If you'd like, I'll pat you down and *make sure you don't have any weapons* and then you can sit in the back of my car so we don't get soaking wet. How does that sound?" Contrast this with Gallo's second request to search: "Hey, before you leave would you have any issues with me just *making sure you don't have anything on you, nothing illegal*?" The latter request was much broader, and so to was Defendant's consent.

No unreasonable search or seizure occurred during the September 14, 2020, traffic stop. The stop was not unreasonably prolonged. Defendant consented to a search after he was free to leave. And the search of his wallet did not exceed the scope of his consent.

Accordingly, it is

**ORDERED:**

Defendant's Motion to Suppress (Doc. 45) is **DENIED**.

**DONE AND ORDERED** in Fort Myers, Florida on April 24, 2024.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record